The case number 18-4132, Cynthia Madej et al. v. Jeff Maiden. The oral argument is not to exceed 15 minutes per side. Mr. Ball for the appellants. Good morning, your honors. May it please the court, my name is David Ball on behalf of plaintiffs' appellants Cynthia and Robert Madej. With the court's permission, I'd like to reserve three minutes for rebuttal. Very well. The district court dismissed the Americans with Disabilities Act and Fair Housing Act claims based on its application of a toxic tort causation standard that's directly at odds with the remedial purpose of these statutes, crafted to protect the opportunity of disabled Americans to benefit from the services of public entities. There's only one element of their FHA and ADA claims issue on this appeal, and that's the necessity of the accommodation they seek. Under Sixth Circuit precedent, under these statutes, showing of necessity requires a simple but-for causation showing. But-for the accommodation they seek, which is an injunction barring the Athens County engineer from using asphalt containing chip seal on the road in front of their home. But-for that accommodation, Ms. Madej will likely suffer the debilitating effects caused by her multiple chemical sensitivity, and in particular, to asphalt. Is the road still unpaved? Yes, it is, your honor. And what was the total length? We're dealing with sort of a one-mile section here, correct? We're dealing with one mile in either direction of her home, so it's a two-mile, and if I'm not mistaken, it's about a four-and-a-half-mile road. What is, I guess I have trouble understanding the causation that's required under the ADA in terms of, the ADA is designed, at least Title II, the accommodation section, is designed to allow disabled individuals to use public services. And it seems to me your claim is if they pave this road, she'll have to leave her home, and her home is not a public service. So where is the actual connection to an inability to use a public service that, you know, we ask, does her disability cause her inability to use a public service just like everybody else would? But here your argument is that her disability with the paving will cause her to not be able to use her home. I don't know that the ADA was meant to cover private homes, is it? At least Title II, the public accommodation section, doesn't seem to me suited to that task. Right. The problem is that, well, the service is the road maintenance program. How is the Athens County engineer going to treat the road in front of her home? Because of his intention to use chip seal, and the way in which the volatile organic compounds off-gas from the chip seal, it would reach her in her home a few hundred feet up the road. So yeah, but her home is not the service itself, and she's not making the claim that she can't use the roads, which I could, I guess, conceive would be services of the government. Her claim here seems to be she just wants to be able to stay in her home. She never goes outside. So I don't understand how the ADA is actually really in play if there's no public service that she's being deprived of. She also requests the ability to come and go from her home. She's denied ingress and of the road maintenance program that has a direct impact on her, both in her home and her ability to travel to and from her home, as she has in the past when she would seek medical treatment in her local community. Well, is this inability to do that temporary? If the road was paved, she could use it, couldn't she? It's not temporary. That's, in a sense, the problem. It's a problem of magnitude and duration. So the chip seal that would be applied on this two-mile stretch would be about 18,000 gallons of asphalt-containing liquid. And the off-gassing would continue for weeks and months. So she would be debilitated for that entire period. That's going to be true. That's why I started with the first question. You have four and she's not going to be able to use the road at all, if that's the case. She's not going to be able to use the other, other than the two miles, if this is going to be giving off these gases and everything all of that time. There is another connection. There are other roads branching off that she would be able to use, even if that one section she's not able to travel in that direction. So what is the testimony of the experts that was excluded that you contend, your client contends, would show this but-for causation? Sure. There were medical tests performed on Ms. Mady. She was tested for sensitivity to petroleum-derived ethanol. And her, Dr. Lieberman testifies that if she's sensitive to petroleum-derived ethanol, she will also be sensitive to other petroleum products like asphalt. There were testing at Dr. Lieberman's practice showing that she has compromised abilities to detoxify. There was a genetic test that also shows her inability to detoxify like many of us are able to do. Her treating physician locally there, Dr. Singer, ordered specific lab tests. Dr. Lieberman has a standard process for evaluating new patients. She stayed in his South Carolina area for about a week in 1999 and was thoroughly evaluated by his colleague, Dr. Shear. She has 20 years of a very clear pattern of temporal correlation between there's asphalt paving, even as little as some pothole patching on her road, or within approximately a mile there are other roads that are approximately a mile away, and every time they're doing the asphalt patching, sometimes she doesn't even know the patching is happening. She comes down with this same unique constellation of severe symptoms, and then later her husband is able to figure out, oh, yeah, there was some patching about a mile away. I'm sorry. You go ahead. I'll follow up. I just did generic research into Daubert and multiple chemical sensitivity, and it seems like the courts have not looked favorably upon the admission of experts who are going to opine that multiple chemical sensitivity is going to cause problems. I've got a District of Oregon case here. To the court's knowledge, no district court has ever found a diagnosis of multiple chemical sensitivity to be sufficiently reliable to pass muster under Daubert, and there's a very long string cite, and this was in 2002. I continued to find cases up through 2008, but then I haven't, over the last past decade, there hasn't been a lot of case law on this, so I guess what, since abusive discretion is the standard of review for the admission of this expert testimony, and we have what I would consider to be an overwhelming number of district courts, at least pre-2008, just almost unanimity, unanimously rejecting kind of diagnoses or descriptions of experts who are going to opine on multiple chemical sensitivity, how am I supposed to find an abusive discretion with that case law? I'm glad you mentioned 2008. That is the key date. That is the date when the Americans with Disabilities Act was amended in order to clarify that expert testimony will not generally be needed in order for someone to establish their claim. I briefed that very issue in our motion for partial summary judgment below, as well as in our opposition to their motion for summary judgment. That case you're talking about from Oregon, it starts with a G. There are cases like that up to 2008. It's a very bleak picture, but when the Amendments Act was passed, it seems that the district courts got the message, and so I've... If I had found a change where district courts started admitting this testimony, that would not be significant in my mind, but it's almost like there's no case law on it after 2008. The way it looks to me is that typically, Daubert challenges are not brought to medical testimony about I have a patient, here's how I've diagnosed the patient. It's really typically not done. Here it was done by applying this toxic tort causation standard, and that's the abuse of discretion. It's really impossible for Ms. Mady to meet the standards of the toxic tort causation standard. There is a... You do have to show, you concede you have to show causation, at least in the abstract. Okay, so I agree with you that this isn't a toxic tort case, and you do have to, but if you didn't provide any evidence that her multiple chemical sensitivity was going to react badly to this chip seal, you would lose. You would concede that, right? You have to be clear. I would say that the standard, as clearly laid out in Sixth Circuit precedent, is will likely occur. So there are vast differences between the toxic tort causation standard, which is the reactions will in fact occur. We believe the evidence does meet that, that it does show will in fact occur, but the abuse of discretion by the district court was not applying the much lower standard under the ADA and the FHA would likely occur, not will in fact occur. And the standard is would there likely be some amelioration of the plaintiff's ability to stay in her home, to travel with the accommodation. It doesn't say that there has to be this drastic impact. The best thing that I've seen, I think, to really capture what the difference is, is that in the Anderson v. Blue Ash case, ADA and FHA causation case, the court distinguished between accommodations that are absolutely necessary and accommodations that are necessary. Accommodations that likely will help. That's the standard under Anderson and Smith & Lee Associates. Do you concede that you at least need expert testimony even to prove the lower legal standard? Excellent question. I concede that it was not an abuse of discretion for the district court to require expert testimony. I don't believe expert testimony is required under the case law. I believe the district court could have gone with us based solely on the testimony of the patient, but I'm not saying that was the abuse of discretion. The district court required expert testimony, wants to evaluate it under Dawbert, fine. It seems like there's two different questions, right? There's the Dawbert question, and then once he determines the Dawbert question, there's the applying the elements of the claim question. That's the secondhand part. If you concede that you need expert testimony, I think Dawbert just goes to, I mean, that's what Gabbard says itself, that Dawbert is different than the actual legal claim, and that you still need to show reliability under Rule 702 to get the threshold to even be able to use that to prove the reduced elements of the claim. So it strikes me that you're still, Dawbert is different than the legal elements in some respects. And the district court said we have to show reliability in meeting the toxic tort standards. We reliably rule in MCS as the cause, reliably rule out everything else. That's a differential diagnosis, that's a toxic tort requirement, not required under the ADA and FHA. I see that my time is up. I just have another question. Oh, that's fine. When you're seeking accommodation, one of the things you have to show that the accommodation would work, in effect, that would be meaningful. And I'm still back, it may sound awfully elementary, but I know your answer to the question, if you put her in a nice hotel for a month while this was being done, this payment would still be giving off fumes and so forth. But then my question is, once you get past this two-mile limit, the same condition exists. So how has that accommodation solved the problem? In her experience, she hasn't been severely reactive beyond about one mile. And that's something that the doctors have evaluated and they believe that makes sense. Well, that's one of the problems. All the experts always said, well, all we know about this case is what she told us. That's typical medical practice, though, is to base it on the patient's history. In this case, it was five hours, taking her patient's history, administered an 80-page questionnaire, so it was based on a lot of solid medical practice. The other problem is it's easier to list the things she's not allergic to than it is the things she's allergic to. That's unfortunately the case. It's very hard to isolate the variables in this case. And that's another reason why the toxic causation standard doesn't work, but it is possible to isolate that this accommodation would help. Thank you. I'm sorry for going over. No problem. Thank you, Mr. Bob. Yes. Good morning, Your Honors. May it please the Court. My name is Molly Gwynn. I'm counsel for the Appley, the Athens County Engineer. I'd like to just start out by correcting a couple of statements regarding the record initially. And I believe the record reflects that Dr. Malott, her proffered expert, examined her outside for only a two-hour period. And I believe the testing that Appellant is relying on in this case was limited to testing performed in 1999 by a doctor who could not recall if he ever saw her in person regarding placement of sublingual petroleum-based ethanol under her tongue. And her physician freely admitted that that could have changed within the 19-year period since this litigation began. I also think it's important to note, in direct contravention to Appellant's statements, that none of her experts have been able to identify a quantity that is harmful to her. They've all stated that it's based on the total load of this environmental science. And I believe that Dr. Lieberman has testified that she could become reactive even outside of the mile. And I think that in hearing this, this just goes to all of the panel's questions that I just heard. And that is that Ms. Maddie's case has a problem on both ends of the spectrum. On the front end, there is no science behind her attempt to establish causation. And for that reason, it doesn't matter that the District Court required general and specific causation as opposed to applying a but-for test. And that's because regardless of the causation standard that's applied, there is no predicate evidence whatsoever supporting the theory that paving of the road will be harmful. What's your view of why the case law seems to have cut off at 2008? I assume that the front end is whether she actually has this multiple chemical sensitivity that will react negatively to the chip seal. I'm just curious why it seems like, it just seems strange to me that the case law seemed to end at that point. Well, I don't know why the case law ends in 2008, but I suspect that it is because multiple chemical sensitivity is best described as a description and not a diagnosis. And the total lack of ability to ground this condition in any kind of scientific method or any kind of objectable, objective analysis is, I think, what has steered people away from trying to root that as an issue. It's a description without a diagnosis. There is almost, there is no way to test for it, her experts have admitted. And when there's no way to test for it, it's very difficult to establish the causation standard that is required under the ADA as well as the FHA. Can I ask the back end question? What's your view on when an accommodation right gets triggered? So there's like a range of evidence ranging from this could actually kill her all the way down to it'll just be like a kind of a week of, you know, uncomfort, uncomfortness. When does the ADA require, what level of harm, I guess, does the ADA get triggered or the FHA get triggered in terms of requiring an accommodation? We would submit that the ADA and the FHA are in fact triggered based on even a mild discomfort. But we would submit that the ADA and the FHA require a showing of equal opportunity based on the accommodation, the necessity of the accommodation, as well as the reasonableness of the accommodation. And the case law from the Sixth Circuit has found that the equal opportunity and the reasonableness inquiry are akin to a causation inquiry. And I think that the court best articulated this in Smith, that the plaintiff does need to show that the proposed accommodation will ameliorate the effects of her disability. And Ms. Maddy cannot demonstrate that. And I think perhaps the most persuasive evidence as to this is that during the pendency of this litigation at the trial court level, and that was from September of 2015 when the injunction was issued to October of 2018 when it was lifted, Ms. Maddy only continued to become sicker, both based on her own testimony as well as the testimony of her expert witnesses. So we would submit that even under a standard but-for causation, there is no evidence that this proposed accommodation, and I want to What do you make of the view that ameliorate can mean, yes, she's getting sicker, but without, if this goes into effect, she'll be even sicker still. So of course she reacts negatively to a host of things, but this will only make it worse, so to speak. Is that sufficient to establish a causation showing just that it will make it worse? I don't believe it's sufficient without expert testimony to demonstrate that it will make it worse in the form of some kind of medical evidence articulating via objective medical science based on a differential diagnosis test that it will make her worse if the injunction is not in place. And the articulation of what is making her sick, even just today I heard a new articulation of that, that it is the asphalt and chip seal. And the record is replete with references to the fact that it's asphalt, it's chip seal, it's volatile organic compounds, it's a variety of factors. And even by Dr. Lieberman's own testimony, her problems are not just limited to asphalt. There is no evidence that a misuse of asphalt will help her. It's really based on herbicides and pesticides and other triggers as well. And I think that based on that evidence, they do not meet the causation requirement that is present. I would also like to just touch on the fact that the citation to the genetic test that Appellant's counsel mentioned, those genetic tests were submitted supplementally in briefing on the summary judgment. They were not disclosed as a witness. And we would submit that they are inadmissible for that purpose. And that is cited in the record. And we would submit that there is no abuse of discretion in excluding the proper medical experts. And as this Court has noted, almost every federal court that has addressed the issue of admissibility of MCS under Daubert has found such testimony to be far too speculative to meet scientific knowledge. And this Court did so in the context of a Social Security disability appeal in the case of Buxton v. Halter. And for those reasons, we would first submit that MCS is at issue. What do you, so the District Court did something a little different than those cases. Those cases just seemed, you can't even testify about a, that a patient has the description or diagnosis of MCS, whereas the Court said, this case, I'll concede that there is MCS, but they haven't shown that it will cause an aggravation with the CHIP seal. It's almost a narrower decision. I assume under, did you argue the broader point that this should just be completely, this whole line of inquiry should be admissible based on these cases? Yes, sir. We did argue that just based on the characterization of the condition, MCS is not a disabling condition. And as you correctly noted, Your Honor, the District Court found that even conceding MCS is disabling, there is still no evidence of harm based on the substance that the county engineer seeks to use on the road or any evidence of harm based, that the harm will be ameliorated based on an alternative substance being used on the road. I would just like to note that the application of the toxic tort standard, the record does reflect that Ms. Maddy's complaint of harm is prospective in nature. The record states that Ms. Maddy testified, my husband and I, my doctors have made him, and that's Jeff Maiden, the Athens County engineer, aware that medical harm will happen if he puts CHIP seal in. And he has decided to pursue putting CHIP seal in, and thus it will cause physical harm if he continues down this path. And given the prospective nature of the harm, we would note that the toxic tort inquiry is proper in that context. And second, as the Court has noted, the District Court failed to include the evidence for not meeting the requirements of Daubert, and that goes specifically to the expert's lack of a methodology and lack of the application of that methodology to the facts at hand. Ms. Maddy's physician, Dr. Singer, indicated that she relied solely on reports from Ms. Maddy, as well as a letter from Dr. Lieberman. And under the case of Taylor B. Heller, expert testimony may not be based on the opinions of others. Dr. Singer also admitted she had no evidence that Ms. Maddy's weakened state was based on the use of CHIP seal. And finally, perhaps most strikingly, Dr. Singer admitted that she had other factors that she knew were contributing to Ms. Maddy's weakened state, and that was an anemic condition, a vitamin D deficiency, as well as potential gastrointestinal issues. So under a differential diagnosis test, or simply under standard causation, there were other factors contributing to the objective symptoms that this patient presented that Dr. Singer admitted had no relationship to CHIP seal or asphalt. Is there, in the workup of this case and whatnot, it's sort of a case to me that cries out, is there a practical solution somewhere? Was there any consideration, what if you put concrete down for those two miles rather than asphalt? Yes, Your Honor, there was analysis done of cost and I believe concrete was extremely cost prohibitive and would have been wiped out the entirety of the county engineer's budget for several years. And as to the practical efforts made to accommodate the Maddy's, the record reflects that a neighborhood meeting was held by the county engineer. The neighbors were welcome to attend. Members of the community did attend, including the school principal as well as the school bus driver. And folks got together and tried to figure out how they could accommodate her, how they could help her. And following that meeting, it was determined that based on the kind of evidence presented, there was really no way to sort of control for all of the factors that affected Ms. Maddy. And I think this is very important to note, the letters that were submitted by Ms. Maddy's proffered expert, Dr. Lieberman, and that the county engineer relied on change over about a 10-day period in the course of this matter. And that is from the time that the meeting was held until the time that the preliminary injunction was issued. And I would just note that the September 4th, 2015 letter authored a mere six days before the ultimate letter requested only that Ms. Maddy be contacted regarding activities on the road. It did not say avoidance. It did not say you cannot pave this. It requested only contact. And then you will see in the record a mere 10 days later, there is a statement that activities be avoided. And the testimony in backing up these letters that were submitted to the county engineer, important to note the county engineer did receive these letters, did consider these letters. The testimony reflects that it was not until September 1st, 2015 that the medical record progress reports note a call from Ms. Maddy to Dr. Lieberman who had been treating her remotely for a 20-year period, not having seen her in person, requesting a letter for asphalting. And that is the first mention of asphalting in this record. And we would submit that the district court did not abuse its discretion in concluding that that is not a scientifically based analysis. That is not an analysis that is supported by the case law. I think that perhaps it was said best in Gass v. Marriott, the ability to diagnose a condition is not the same as the ability to determine cause and causation in a scientific manner. And so I think that the letters were there and there was some practical inquiry made to see if some assistance could be done. I think it's also important to note that the requested relief in this case is an injunction prohibiting the use of dust suppressants or chip seal on the road. And it's rather broad. It's for a two-mile area. And again, we have no evidence to support the fact that that will ameliorate her condition. And we have no evidence to support the fact that the laying of the chip seal caused her the initial harm. And no matter how sick a person is, you cannot force an accommodation where there is not evidence that the accommodation is needed in this case. And so with that, we would respectfully ask the district court to, excuse me, ask this court to please affirm the decision of the district court granting some judgment. Thank you, Your Honors. Three quick points. First of all, as to whether or not there's any objective medical science at issue here, the case criteria for diagnosing MCS are well established. Dr. Malott discussed those, evaluated Ms. Mady according to those case criteria. True, there's no blood test. You can't do a cheek swab. But like other illnesses, motor chemical sensitivity is evaluated according to six criteria. He evaluated her. She met all of them. Can the sensitivity not change over time, though, to various chemicals? The testimony of the experts is that she's becoming more sensitive. The quote about how Ms. Mady continues to get sicker, if you read the very next sentence in her deposition transcript, which neither defendant nor the district court quoted, she said, it's that I continue to become more sensitive. But is it true her last testing done of the particular substance that's in the chip was in 1999? Is that correct? That is correct. As for this claim that there's nothing in the record prior to 2015 about her sensitivity to Chipseal, as if all of a sudden when the trucks are getting ready to roll, she scurried and all of a sudden made this claim out of thin air, that's completely false. There are citations in the record about how on the intake form she filled out in 1999 she said that she thought she was sensitive to tar and asphalt. That's at document 91 below, page 3244. Dr. Lieberman testified in his deposition, yes, sensitivity to asphalt. That's why she came to our practice. That's the problem she was having in 1999. That's at document 91, page 2960. And clear cut, right there it is in a 2010 letter, five years before he listed asphalt sensitivity. That's document 91, page 3134. The practical solution is there. The world's leading expert on alternative road treatment for situations where for whatever reason asphalt cannot be used or asphalt is not cost effective is the expert that we have provided, Dr. Jones from the University of California, Davis. The district court didn't reach those issues. But we have not only moved to exclude their expert for his clear errors in trying to say that it would be more costly, but we've briefed the admissibility of our expert who has testified that it's products as simple as salts, magnesium chloride, calcium chloride. And their expert, Dr. Creech, admits that they work. Those materials work. That's at 105-1. You're talking about a dust suppressant? Dust suppressant, that's correct. How do you know she wouldn't react to those? They're salts, just like you salt the road in the winter. She's also, with her husband, mixed up these alternative treatments and applied them to herself and she was not immune. Do you have doctor expert testimony on that? On the testing that she did? On the alternatives, she won't react negatively to the alternative dust suppressants? It's Dr. Lieberman saying these are salts. These are medically no different than the salt you use to take the ice off the road. And then Dr. Malott interviewed Ms. Mady about how she had administered these products to herself in detail and found that she had done it in a scientifically valid way. And it satisfied him that these products would be safe. Thank you. Thank you. Thank you, counsel. The case will be submitted.